IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

02-22322

QWEST COMMUNICATIONS
CORPORATION,

        Plaintiff,

v.

BLACKSTONE CALLING CARD, INC.,

        Defendant.

_____/

Misc. Docket No.:  **CIV-GRAHAM**

Civil No. 02-454-A
Pending in the U.S. District Court
Eastern District of Virginia

**MAGISTRATE JUDGE**
**GARBER**

NIGHT BOX FILED

**PLAINTIFF QWEST'S MOTION TO COMPEL
RESPONSE TO THIRD PARTY SUBPOENA
AND SUPPORTING MEMORANDUM OF LAW**

Plaintiff Qwest Communications Corporation ("Qwest"), pursuant to Fed. R. Civ.

P. 26(b)(1) and 45(c)(2)(b), moves for an Order compelling Third Party Ocean Bank ("Ocean

Bank") to produce documents pursuant to the third party subpoena served on June 21, 2002.  In

support of this Motion, Qwest submits the accompanying Memorandum of Law.

**Memorandum Of Law**

**I.     Introduction**

Defendant Blackstone Calling Card, Inc. ("Blackstone") ordered *millions* of

dollars of prepaid calling services from Qwest Communications Corporation ("Qwest") – then

simply refused to pay for the services that Qwest provided.  Qwest sued Blackstone in the

Eastern District of Virginia.  Discovery closes on September 13, 2002.

Blackstone placed its financial condition directly at issue in the case.  It asserts

that Qwest's prepaid calling products were defective and unusable.  Blackstone claims that it

suffered millions of dollars in damages and lost profits when end user customers stopped using

1-MI/453580.1

MORGAN, LEWIS & BOCKIUS LLP
5300 FIRST UNION FINANCIAL CENTER, 200 S. BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131-2339 · TELEPHONE (305) 579-0300

its products, which impaired Blackstone's relationship with distributors, harmed its goodwill, and damaged its business relationships with retailers and customers.

To examine Blackstone's claims, Qwest served a subpoena on Blackstone's bank -- Ocean Bank -- seeking documents about Blackstone's financial condition. Blackstone has stated no objection to the subpoena served on Ocean Bank. Ocean Bank has failed to state an objection let alone a proper objection for not complying with the subpoena but has failed to produce any documents.

The documents that Qwest seeks bear *directly* on Blackstone's contention that Qwest damaged Blackstone's business and finances. The parties have entered into a lengthy protective order in the Virginia litigation, so no confidentiality concerns exist, and other third parties have already produced documents about this case under the terms of the protective order. Finally, obtaining discovery from one source (Ocean Bank) about Blackstone's damages is far more efficient and far less burdensome than seeking discovery from hundreds of retailers and distributors that Blackstone claims have stopped doing business with it. For all these reasons, Qwest respectfully requests that the Court order immediate compliance by Ocean Bank.

## II.    Background

### A.    The Dispute.

Qwest provides telecommunications services over local and long distance networks throughout the United States and the world. Blackstone is one of the largest wholesalers of prepaid calling services in the United States. On June 21, 1999, Qwest and Blackstone executed a Prepaid Customer Order Form and Agreement and Amendment Number 1 to the Agreement (the "Agreement"), under which Qwest agreed to sell prepaid long distance calling card services to Blackstone.

Under the Agreement, Blackstone periodically requested that Qwest issue a series of personal identification numbers ("PINs") to Blackstone.  Blackstone sold the PINs to end user consumers, or sold calling cards associated with the PINs.  End user consumers who purchased the PINs or cards then had direct access to Qwest's network to make long distance calls up to the value of the PIN or card purchased.

From December 2001 to March 2002, Blackstone contacted Qwest and asked to purchase approximately $11.3 million of PINs.  Blackstone faxed purchase orders to Qwest for the PINs Blackstone wanted to purchase, and Qwest activated the PINs requested by Blackstone.  However, Blackstone did *not* pay for all of the PINs that Qwest had activated.  Rather, Blackstone accepted the activated PINs, sold the PINs to its customers, and refused to pay Qwest the outstanding amount.

On March 27, 2002, Qwest filed its Complaint against Blackstone in the United States District Court for the Eastern District of Virginia.  Qwest alleged that Blackstone: (1) breached the Agreement by refusing to pay for the PINs that it requested activated; (2) was unjustly enriched by receiving the PINs and not paying for them; and (3) defamed Qwest by posting false statements about Qwest and its services on the Internet.  A copy of the Complaint is attached as Exhibit 1.

In its Seventh Affirmative Defense to Qwest's Complaint, Blackstone alleged that it was entitled to set off any award to Qwest against its claims in a lawsuit that Blackstone filed against Qwest in Florida.  In that suit, Blackstone alleged that Qwest breached the Agreement and sought, among other damages, the profits that it lost from its inability to sell the Qwest products and the loss of its business reputation with its distributors, retailers and customers.

On April 29, 2002, the Court issued a Scheduling Order setting September 13, 2002 as the deadline for concluding all discovery.

**B.     Ocean Bank Refuses To Respond To Qwest's Subpoena.**

On June 21, 2002, Qwest served a third-party subpoena on Ocean Bank seeking materials about Blackstone's assets and financial condition. *See* Subpoena and Affidavit of Service, attached as Exhibit 2. Ocean Bank has refused to respond in any way even though Blackstone has not raised any objections.

On July 3, 2002, Ocean Bank sent a letter to Qwest informing it that Ocean Bank would not provide any documents responsive to Qwest's subpoena, simply stating that it "object[ed] to inspection and copying of all of the designated materials [in] [Qwest's] [subpoena]." *See* Exhibit 3 hereto. On July 8, 2002, Qwest requested that, pursuant to Rule 45(c)(1)(B) of the Federal Rules of Civil Procedure, Ocean Bank provide the basis for its objection to the subpoena. *See* Exhibit 4 hereto. On July 18, 2002, Ocean Bank informed Qwest that Ocean Bank would provide no further information about its non-compliance, and Qwest again asked Ocean Bank to provide a basis for its objection pursuant to Rule 45(c). *See* Exhibit 5 hereto. Ocean Bank has never responded.[1]

**C.     The Court Enters An Extensive Protective Order.**

On July 1, 2002, the Eastern District of Virginia entered an extensive Protective Order. *See* Exhibit 6 hereto. Under the Protective Order, any party to the action, or any third party that is subject to a discovery request, has the right to designate information responsive to a discovery request as "confidential" or "highly confidential." In that event, extensive protections preclude dissemination of the documents. For example Paragraph 3 of the Protective Order restricts the disclosure of "confidential" materials only to the following persons: the parties,

---

[1]     Although the subpoena seeks information about Blackstone and its President, Luis Arias, at this time Qwest is only moving to compel documents relating to Blackstone. Qwest reserves the right to move to compel documents about Mr. Arias at a later date.

counsel of the parties, deposition notaries, clerical employees of the parties, experts, deponents, and the Court.

Thereafter, Qwest and Blackstone designated certain proprietary information as "confidential" or "highly confidential" and produced the information under the Protective Order. Third parties with documents relevant to this lawsuit also have produced information under the Protective Order. For example, Union Telecard Alliance, LLC, a business partner of Blackstone's, and Digital Ink, Inc., the printer of Blackstone's calling cards, have already produced documents pursuant to the Protective Order. All the documents that they produced are designated "confidential" or "highly confidential" and are protected by the Order.

### III.    Argument

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that a party --

> may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence . . .

Fed. R. Civ. P. 26(b)(1). Where the documents sought "fall squarely within the scope of Rule 26," a court will grant a plaintiff's motion to compel a third-party to respond to a subpoena. *Bulkmatic Transport Co., Inc. v. Pappas*, No. 99 Civ. 12070(RMB)(JCF), 2001 WL 504839, * 2 (S.D.N.Y. May 11, 2001). Federal courts routinely order banks like Ocean Bank to produce documents that relate directly to a party's claims, defenses or damages. *See, e.g., Richmark Corp. v. Timber Falling Consultants, Inc.*, Civ. No. 88-1203-FR, 1989 WL 112811 (D. Or. Sept. 21, 1989)(ordering bank to produce defendant's financial records because they were relevant to defendant's claim of damages); *Audiotext Comm. Network, Inc. v. U.S. Telecom, Inc.*, Civ. A. No. 94-2395-GTV, 1995 WL 625962, *4 (D. Kan. Oct. 5, 1995)(denying motion to quash

subpoenas issued to banks because documents relating to plaintiff's accounts were "relevant to the issue of damage calculation and lost profit").

### A.   Ocean Bank Possesses Relevant Information.

No question exists that the documents Qwest seeks from Ocean Bank fall squarely within the scope of Rule 26. Qwest asserts that Blackstone breached an agreement in which Qwest agreed to sell prepaid long distance calling card services to Blackstone. In its Answer, Blackstone claims that because of Qwest's deactivation of the PINs, it could not sell calling cards with the Qwest PINs, and as a direct result, suffered both lost profits, money damages, and impairment of its business relationship with distributors, retailers and customers.

The materials sought by Qwest's subpoena to Ocean Bank will test the veracity of Blackstone's contentions. For example, Request No. 5 seeks --

- All work papers and financial statements or similar statements of the assets, liabilities and/or net worth, including but not limited to statements from all checking, savings, trust and brokerage accounts maintained by them or on their behalf, from January 1, 2001 through the present, of Blackstone.

Likewise, Request No. 10 seeks --

- All spreadsheets and or financial projections from January 1, 2001 through the present regarding Blackstone.

Exhibit 2. These documents will show profits or losses sustained by Blackstone during the time in which Blackstone claims it suffered lost profits. Balance sheets will detail Blackstone's assets and liabilities, and income statements will show Blackstone's income and expenses. These documents will show whether Blackstone's business suffered any negative impact from Qwest's actions (as Blackstone contends) -- or whether Blackstone's business actually flourished because of nonpayment (as Qwest believes). The materials are discoverable. *See Linea Pelle, Inc. v. Omega Fashions Ltd.*, No. 95 Civ. 0138, 1997 WL 13267, *1 (S.D.N.Y. Jan. 15, 1997) ("Plaintiff, if it wishes to pursue a lost profits damage theory. . . is to produce to counsel for

defendant copies of its financial statements. . . The Court finds that the financial statements are relevant to any claim for lost profits."); *Henderson v. Compdent of Tenn., Inc.*, No. Civ. A. 97-617, 1997 WL 756600 (E.D. La. Dec. 4, 1997)(in breach of contract action involving the sale of prepaid dental plans to employers, court granted defendant's motion to compel plaintiff's checking and money market account records because they related directly to plaintiffs claim of damages for lost profits).

Similarly, in Requests Nos. 1-3 Qwest seeks --

- All Ocean Bank account records of Blackstone;

- All agreements, including without limitation account opening documents and new account forms, of Blackstone; and

- All documents regarding loans that Ocean Bank made to Blackstone.

Exhibit 2. These documents will demonstrate any loss sustained by Blackstone to its goodwill – *i.e.* its name and reputation. For example, account records will indicate Blackstone's earnings, and will show whether Blackstone's name and reputation has been damaged in the view of the outside world. Obviously, if Blackstone's reputation has been harmed by Qwest as Blackstone alleges, its earnings will have decreased since the parties' dispute. Like Blackstone's financial statements, these materials clearly fall within the broad scope of discovery permitted under Rule 26. *D.E.J.S.A. Corporation v. Shooster*, Civ. A. No. 92-2953, 1993 WL 65816 (E.D. Pa. March 9, 1993)(in breach of contract action, court granted defendant's motion to compel plaintiff's bank account records because they related directly to plaintiffs claim of harm to its goodwill); *Versatile Metals, Inc. v. Union Corp.*, Civ. A. No. 85-4085, 1987 WL 5290 (E.D. Pa. Jan. 7, 1987)(where plaintiff claimed loss of goodwill and reputation, court found that "plaintiffs' tax returns and financial statements. . . are relevant and material to this action and shall be disclosed.

Plaintiffs have put their own financial condition at issue in this case by claiming that they suffered losses due to defendants' actions").

### B. Obtaining Discovery From Ocean Bank Is The Most Efficient Way Of Assessing Blackstone's Claims.

Whenever possible, parties to litigation should reduce the burdens of discovery, and take discovery of the fewest number of persons possible. *See, e.g., Ward v. Ford Motor Co.*, 93 F.R.D. 579 (D. Colo. 1982)(more efficient to take discovery from one party than to subject all other parties to effort and expense of repetitive discovery). Qwest's subpoena to Ocean Bank does exactly that.

Blackstone claims that, as a result of Qwest's actions, its end user customers stopped using its products causing money damages, impairing Blackstone's relationship with distributors, and causing Blackstone to suffer loss of goodwill, damage to its business relationships with retailers and customers, and lost profit. Moreover, Qwest has learned during discovery that Blackstone sells calling card products to hundreds of distributors, and according to its website is a "leading distributor of prepaid products, servicing over 300,000 retail accounts nationwide."

If Qwest tried to take discovery of every Blackstone customer and every Blackstone distributor to rebut Blackstone's claims of damage to its business, the burdens on Qwest, Blackstone, the third parties and the Court would be, to say the least, immense. Even apart from the burdens involved, discovery closes in Qwest's Virginia lawsuit on September 13, 2002, and taking hundreds of individual depositions could take months to complete. By contrast, the single subpoena that Qwest served on Ocean Bank is the most efficient way to examine whether Blackstone's business has truly been harmed (as Blackstone alleges), and will eliminate the burdens for all concerned.

MORGAN, LEWIS & BOCKIUS LLP
5300 FIRST UNION FINANCIAL CENTER, 200 S. BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131-2339 · TELEPHONE (305) 579-0300

### C.    Rule 45 Forbids Blanket Objections.

In response to Qwest's subpoena, Ocean Bank simply "object[ed] to inspection and copying of all of the designated materials [in] [Qwest's] [subpoena]." However, Rule 45(d) imposes an obligation to provide *specific* objections to subpoenas. *See Massachusetts School of Law at Andover, Inc. v. American Bar Association*, 914 F. Supp. 1172 (E.D. Pa 1996). Courts consistently condemn general objections, like Ocean Bank's, as insufficient to comply with Rule 45. *Id.* at 1178 (Rule 45 "requires a party who withholds subpoenaed information on the grounds of privilege to make the claim expressly and to describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection"); *see also Tuite v. Henry*, 98 F.3d 1411, 1416 (D.C. Cir. 1996)("a party objecting to a subpoena on the basis of privilege must both (1) object to the subpoena and (2) state the claim of privilege within fourteen days of service. . ."); *Compaq Computer Corp. v. Packard Bell Electronics, Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995)("Acer's formal objections to the subpoena contain general objections. . . These general objections do not satisfy the requirements of Rule 45(d)(2)").

Ocean Bank may contend that the materials Qwest seeks should not be produced because Qwest seeks information about the financial condition of its customer. However, the Eastern District of Virginia already entered an extensive Protective Order in the case, and as noted above other third parties are already producing materials under the protections afforded by the Order. The Court should therefore reject any alleged concerns about confidentiality. *See R.J. Reynolds Tobacco v. Philip Morris, Inc.*, No. 00-4226, 2002 WL 334111, *1 (3d Cir. Feb. 28, 2002)(rejecting third party's contention that materials sought by plaintiff's subpoena were privileged as trade secrets because "the disclosure required by [plaintiff's] subpoena would be

## CERTIFICATE OF SERVICE

I hereby certify that on this **5ᵗʰ** day of August, 2002, I served Plaintiff Qwest

Communications Corp.'s Motion to Compel by causing copies to be sent delivered by fax and

U.S. mail, postage prepaid, to:

> Michael C. Montero
> OCEAN BANK
> 780 N.W. 42nd Avenue
> Suite 300
> Miami, Florida 33126
>
> Counsel for Third-Party
> OCEAN BANK; and
>
> H. Robert Showers
> GREBER, SIMMS & SHOWERS, LLP
> 350 Harrison Street SE
> Third Floor
> Leesburg, Virginia 20175
>
> W. Charles Bailey, Jr.
> GREBER, SIMMS & SHOWERS, LLP
> 20 S. Charles Street
> Suite 702
> Baltimore, Maryland 21201
>
> Counsel for Defendant
> BLACKSTONE CALLING CARD, INC.

Gustavo J. Membiela

made under the limitations of [a] protective order"); *Mycogen Plant Science, Inc. v. Monsato*

*Co.*, 164 F.R.D. 623, 626 n. 7 (E.D. Pa. 1996)("[o]rders forbidding any disclosure of trade

secrets or confidential commercial information are rare.  More commonly, the trial court will

enter a protective order restricting disclosure to counsel or to the parties")(quoting *Federal Open*

*Market Committee v. Merrill*, 443 U.S. 340, 362 n. 24 (1979)); 8 Charles A. Wright and Arthur

R. Miller, *Federal Practice and Procedure* § 2043 (2d ed. 1994)("It is well settled that there is

no absolute privilege for trade secrets and similar confidential information; the protection

afforded is that if the information sought is shown to be relevant and necessary, proper

safeguards [protective orders] will attend disclosure").

## IV.    Conclusion

For these reasons, Qwest respectfully requests that the Court grant its Motion and

order Ocean Bank to respond immediately and fully to Qwest's subpoena.

Respectfully submitted,

Robert Brochin
Fla. Bar No.: 319661
Gustavo J. Membiela
Fla. Bar No.: 0513555
MORGAN, LEWIS & BOCKIUS LLP
5300 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
(305) 579-0300

Douglas P. Lobel (VSB #42329)
MORGAN, LEWIS & BOCKIUS LLP
1600 Tysons Boulevard, 12th Floor
McLean, VA 22102
(703) 918-1000

Counsel for Plaintiff
QWEST COMMUNICATIONS CORPORATION

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)



QWEST COMMUNICATIONS CORPORATION,
4250 North Fairfax Drive,
Arlington, VA  22203

                         Plaintiff,

    v.

BLACKSTONE CALLING CARD, INC.,
11600 NW 34th Street,
Miami, FL  33178

                         Defendant.

Serve:     Brian Fink, Esq.
             Catlin Saxon Tuttle Evans Fink
              & Kolski, P.A.
             169 East Flagler Street
             Suite 1700
             Miami, FL  33131
             Registered Agent

No. CA-02-454-A

## COMPLAINT

Qwest Communications Corporation ("Qwest"), by counsel, alleges as follows:

### PARTIES

1.     Qwest is a Delaware corporation with its principal place of business in Denver, Colorado. Qwest maintains a substantial facility in the Ballston area of Arlington, Virginia that is directly involved in the allegations of this lawsuit.

2.     Defendant Blackstone Calling Card, Inc. ("Blackstone") is a Florida corporation with its principal place of business in Miami, Florida.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

4.      Venue is proper in this District under 28 U.S.C. § 1395(a)(2) because a substantial part of the events and omissions giving rise to this claim occurred here.

## FACTS

I.      QWEST'S PREPAID LONG DISTANCE CALLING CARD SERVICE

5.      Qwest is a telecommunications carrier regulated by the Federal Communications Commission ("FCC") and state public utility commissions.

6.      Qwest operates local and long distance networks throughout the United States and the world.

7.      Qwest provides an array of communications services to other telecommunications carriers and to consumers over its networks.

8.      One service that Qwest offers to other telecommunications carriers is Qwest's prepaid long distance calling card service ("Prepaid Service").

9.      Qwest contracts with other telecommunications carriers that purchase, at wholesale, blocks of minutes of use on Qwest's network. The wholesaler then resells those minutes to the public in calling cards sold in stores and other public locations.

10.    One part of Qwest's Prepaid Service allows other telecommunications carriers to resell Qwest's network services to retail outlets and end-user consumers. Under this business arrangement, Qwest's only customer is the wholesale carrier, not the end-user consumer. The retail outlets and end-user consumers are the customers of the wholesale carrier.

11.    The individual end-user purchases a Prepaid Calling Card either directly from the wholesale carrier or from a retail outlet selling the wholesale carrier's Prepaid Calling Card. In no instance would an end-user consumer be able to purchase a wholesale carrier's Prepaid Calling Card from Qwest. Although the Prepaid Calling Cards should state that the telecommunications services are provided by the wholesale carrier, the long distance calls made by the end-users are carried over Qwest's network pursuant to the agreement between Qwest and the wholesale carrier.

12.    Callers dial an access number that connects the call to Qwest's network. When the call is acknowledged, the caller enters the Personal Identification Number ("PIN") associated with the card. Qwest's system notifies the caller of the amount of time remaining on the card, and the caller enters the desired telephone number to place a call.

13.    When a wholesale carrier purchases Prepaid Services from Qwest for resale to the public, the carrier must first ask Qwest to activate the PINs associated with those cards to allow the end-users to make long distance calls. Once Qwest activates a calling card, it is as valuable as cash--the person or entity holding the card can immediately place calls over Qwest's network up to the maximum value of the card involved.

## II.    THE PARTIES' AGREEMENT

14.    Blackstone is a wholesale provider of Prepaid Calling Cards, and the associated telecommunications services, to retail outlets and end-users.

15.    On June 21, 1999, Qwest and Blackstone executed a Prepaid Custom Order Form and Agreement (the "Agreement") and Amendment No. 1 to the Agreement (the "Amendment"). *See* Exhibits 1 & 2 hereto.

16.    Blackstone sent its executed version of the Agreement and the Amendment to Qwest's facility at 4250 North Fairfax Drive, Arlington Virginia, the office from which Qwest administers its Prepaid Services. Paragraph 7(a) of the Agreement further required Blackstone to deliver all notices under the Agreement to Qwest's Arlington, Virginia office.

17.    Under the Agreement and the Amendment, Blackstone agreed to purchase Prepaid Services from Qwest.

18.    The Agreement and Amendment required Blackstone to prepay, in full, the costs of all PINs that Blackstone wishes to activate.

19.    Specifically, Paragraph 5 as amended provides that "Customer [Blackstone] shall tender to Carrier [Qwest] full payment for all PINs which Customer requests to be activated prior to Carrier activating PINs." The Customer Order Form that Blackstone executed provides several methods of payment; the parties checked the box labeled "PREPAY PER ACTIVATION."

20. Because activation of a card grants the end-user immediate access to Qwest's network, consistent with industry custom, the parties agreed that Qwest could deactivate cards in the event of nonpayment, fraud or other improper activity.

21. Specifically, Paragraph 12(d) of the Agreement as amended by Amendment No. 1 provides that "Carrier, in its sole discretion, shall have the right to immediately deactivate Prepaid Cards in the event Carrier reasonably believes such Prepaid Cards have been improperly activated or are the subject of suspected fraud or theft and shall not be liable to Customer, End User or any third party for such action. Provided, however, Carrier shall not deactivate any activated PINs for which payment has been received from Distributor and for which there is no reasonable evidence of fraudulent activity."

22. Blackstone agreed, in Paragraph 10(b) of the Agreement, to indemnify Qwest against, among other things, all "loss" or "damage" that Qwest has incurred as a result of "any breach by [Blackstone] of any of its obligations" under the Agreement.

23. Paragraph 2(a) of the Agreement incorporates by reference into the Agreement Qwest's Interstate Telecommunications Tariff No. 1 on file at the FCC, which describes the terms, conditions, and charges under which Qwest provides prepaid calling card and other long distance services. Effective July 31, 2001, the FCC ordered that carriers like Qwest detariff and, instead, provide its terms, conditions and charges in a Rates and Services Schedule. Qwest's Rates and Services Schedule is posted on Qwest's website at www.qwest.com.

III.    BLACKSTONE'S REFUSAL TO PAY QWEST

24.    Blackstone began requesting Prepaid Services from Qwest under the Agreement in November 1999.

25.    Upon information and belief, Blackstone printed its own prepaid long distance calling cards and sold them to stores, gas stations and other commercial establishments for sale to the public. Blackstone also sells Prepaid Calling Cards directly to end-users over its websites at www.blackstoneonline.com and blackstonecallingcard.com and through Point of Sale ("POS") terminals.

26.    Generally, when Blackstone wished to purchase Prepaid Services, it would fax to a Qwest account manager located at Qwest's Arlington, Virginia office (1) a purchase order describing the number of PINs Blackstone wished to activate; and (2) a copy of a Blackstone check to Qwest for the amount of network usage that Blackstone was purchasing via the activation of PINs. Blackstone would then send the actual check to Qwest by overnight mail.

27.    From December 1999 though November 2001, Blackstone typically purchased between $2-$4 million in Prepaid Services from Qwest each month. Blackstone regularly faxed copies of checks to Qwest at its Arlington, Virginia office, and regularly sent checks to the Qwest Accounts Receivable lockbox promptly after faxing copies of the checks to Qwest.

28.    In December 2001, Qwest offered to Blackstone certain promotions. Under these promotions, Qwest agreed to provide discounted service to Blackstone if Blackstone agreed to purchase minimum numbers of prepaid calling cards from Qwest.

29.     Blackstone sent requests to Qwest to activate more than $10 million in cards in December 2001, an amount in excess of its ordinary usage. Blackstone sent these requests to Qwest's facility in Arlington, Virginia.

30.     Blackstone requested that Qwest continue the discount promotions into and through the end of January 2002.  Qwest agreed.

31.     Blackstone sent purchase orders and faxed copies of checks for both the December 2001 and January 2002 activations.  However, contrary to its former practice, Blackstone failed to send actual checks or other forms of payment to Qwest's lockbox for the calling cards that Qwest activated.

32.     Qwest contacted Blackstone in early March 2002 to obtain the missing checks.  Blackstone employees admitted that Blackstone had not sent the checks to Qwest.  Blackstone offered a variety of excuses about its refusal to pay, such as alleged defects in the quality of the cards and Qwest's network operation.  However, Blackstone had never mentioned any of those reasons at the time that it requested activation or at the time it faxed copies of the checks to Qwest.

33.     Qwest made repeated demands to Blackstone throughout March 2000 to pay Qwest for the calling cards that Qwest provided to Blackstone.  Blackstone refused all such requests.

34.     On March 23, 2002, Qwest deactivated all calling cards for which Blackstone had refused to pay Qwest, and for which Qwest's system showed no first use by an end-user customer.  Qwest did not deactivate any unpaid cards where an end-user customer had already used the card once to access Qwest's long distance network.  Prior to this deactivation, Qwest asked Blackstone for a list of PINs located in Blackstone's

warehouse so that Qwest could deactivate only non-used cards and not cards already in the public domain. Blackstone refused to provide this information.

35.    After Qwest deactivated the calling cards that Blackstone refused to pay for, Blackstone began a campaign to denigrate Qwest, its services and its reputation. Upon information and belief, Blackstone began posting letters on industry bulletin boards accessible world wide over the Internet. These letters inaccurately described the dispute with Qwest, accused Qwest of violating Florida law, and solicited complaints from the public about alleged problems with Qwest service.

36.    Many of the statements that Blackstone posted on industry bulletin boards were knowingly false. Blackstone made them intentionally to harm Qwest in retaliation for Qwest exercising its legal rights under the Agreement to deactivate cards that Blackstone never paid for.

## COUNT ONE

### (Breach of Contract)

37.    Qwest repeats the allegations of Paragraphs 1-36 as if fully set forth herein.

38.    Qwest provided prepaid calling card services to Blackstone under the Agreement and the Amendment.

39.    Blackstone used the prepaid cards, and resold them over its website, through POS terminals, and to commercial establishments for resale to the public.

40.    Blackstone refused to pay Qwest for the services as required by the Agreement and the Amendment.

41.     Qwest repeatedly demanded payment for the services Qwest provided to Blackstone.

42.     Despite Qwest's repeated demands, Blackstone refused to make payment to Qwest for the services Blackstone received.

43.     Blackstone refused to make payments for services as required under the Agreement and the Amendment of approximately $8,200,000.  After Qwest deactivated cards on March 23, 2002, the amount owed by Blackstone to Qwest remains in excess of $2,000,000.

<u>COUNT TWO</u>

**(Unjust Enrichment)**

44.     Qwest repeats the allegations of Paragraph 1-43 as if fully set forth herein.

45.     Qwest conferred a benefit on Blackstone by providing prepaid long distance calling card services.

46.     Blackstone voluntarily accepted, used and enjoyed Qwest's prepaid long distance calling card services.

47.     Qwest reasonably believed that Blackstone would pay Qwest for the prepaid long distance calling card services that Qwest provided to Blackstone.

48.     Blackstone refused to pay Qwest for the services Blackstone accepted and used.

49.     Allowing Blackstone to accept and use the prepaid long distance calling card services would be inequitable and unjust to Qwest, and Blackstone would be unjustly enriched if it is not required to pay for those services.

## COUNT THREE

### (Slander of Title/Defamation)

50.　　Qwest repeats the allegations of Paragraphs 1-49 as if set forth fully herein.

51.　　Upon information and belief, Blackstone made false statements about Qwest and its services and the parties' dispute.

52.　　Blackstone made these statements intentionally to harm Qwest, and in retaliation for the fact that Qwest exercised its legal right under the Agreement to deactivate calling cards for which Blackstone had not made payment.

53.　　Blackstone's false statements caused immediate harm to Qwest and its reputation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Qwest Communications Corporation respectfully requests that the Court enter judgment against Defendant Blackstone Calling Card, Inc. awarding Qwest:

    (1)    damages of at least $2 million, plus additional damages that Qwest may prove at trial;

    (2)    punitive damages for Blackstone's intentional false statements about Qwest and its services;

    (3)    interest on all amounts that Blackstone refused to pay Qwest;

    (4)    all damages that Qwest has incurred as a result of Blackstone's actions, including Qwest's attorney's fees and expenses, as required under Paragraph 10(b) of the Agreement; and

    (5)    such other relief as the Court deems just and proper.

Respectfully submitted,

Douglas P. Lobel (VSB # 42329)
Joseph F. Yenouskas (VSB # 27393)
MORGAN, LEWIS & BOCKIUS LLP
1600 Tysons Boulevard
McLean, VA  22102
(703) 918-1000 (phone)
(703) 918-1999 (fax)

Counsel for Plaintiff
Qwest Communications Corporation

Dated:  March 27, 2002

**EXHIBIT 2**

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

## Issued by the
# UNITED STATES DISTRICT COURT

__SOUTHERN__ DISTRICT OF __FLORIDA__

QWEST COMMUNICATIONS CORPORATION

V.

BLACKSTONE CALLING CARD, INC.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER: ¹ 02-454-A

PENDING IN THE UNITED STATES DISTRICT CT.
EASTERN DISTRICT OF VIRGINIA

TO:   OCEAN BANK
      Attn: Luis Consuegra, Registered Agent
      780 N.W. 42nd Ave., Suite 300
      Miami, Florida 33126

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE | DATE AND TIME |
|---|---|
| MORGAN, LEWIS & BOCKIUS LLP, Attn: Robert Brochin, 5300 First Union Financial Center, 200 S. Biscayne Blvd., Miami, FL 33131 | July 8, 2002 12:00 PM |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _[signature]_ Attorney for Plaintiff | 6/31/02 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Douglas P. Lobel, MORGAN, LEWIS & BOCKIUS LLP, 1600 Tysons Blvd., McLean, VA 22102, 703.918.1000

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

¹ If action is pending in district other than district of issuance, state district under case number.

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SONY WEB 4/99

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 6.24.02 | 780 NW 42 ave  Miami Fc. |

SERVED ON (PRINT NAME)                  MANNER OF SERVICE

(Records) Lesley Stednick          Assit. to Luis Consuegra

SERVED BY (PRINT NAME)                  TITLE

Luis deCastro              P. Server

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___6.24.02___
DATE

SIGNATURE OF SERVER

17 w Flg. st. Mio4

ADDRESS OF SERVER

Miami Fc.

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)  (A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)  (A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance,

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that,

subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A

### Instructions

1.      If you object to any request on grounds other than privilege or work-product immunity, state in detail the basis for the objection.

2.      If you contend that a particular request, or a definition or an instruction applicable thereto, is ambiguous, such claim shall not provide a basis for refusing to respond. You are instructed to set forth the allegedly ambiguous language and the interpretation of that language that you have adopted in responding to the request in question.

3.      You should produce every copy of a document that is not identical to the original of the document requested.

4.      You should produce all documents requested below that are within your custody or control, including documents within the custody or control of your present or former attorneys, accountants, representatives, consultants, agents, officers, directors, employees, investigators, or anyone else acting on your behalf.

5.      With respect to each document otherwise responsive to this request that has been lost, discarded, destroyed, or is no longer in your custody or control, identify (a) each author; (b) each addressee; (c) the date, title and subject matter of the document; (d) the date of the disposal; (e) the manner of the disposal; (f) the reason for the disposal; (g) each person who authorized the disposal; (h) each person who carried out the disposal; and (i) each person with any knowledge concerning the disposal.

6.      The present tense includes the past and future tenses.

7.      The use of the singular form of any word includes the plural and vice-versa.

)                                           )

8.      The connectors "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

<u>Definitions</u>

1.      The term "document" is used in its broadest sense and means and includes graphic matter of any kind or nature, whether written, printed, typed, recorded, filmed, punched, transcribed, taped or produced or reproduced by any means.  The term "document" means and includes, without limitation, all agreements, contracts, appraisals, records, personal notes, e-mails, cablegrams, telexes, facsimiles, studies, calendars, day-timers, diaries, desk calendars, appointment books, agendas, minutes, pamphlets, envelopes, telephone messages, graphs, records of meetings, summaries or records of telephone conversations, summaries or records of personal conversations of interviews, summaries or records of meetings or conferences, tabulations, analyses, evaluations, projections, work papers, statements, summaries, reports, journals, billing records, invoices, correspondence, letters, financial statements, balance sheets, accounting entries, tax returns, loan documents, and/or all written or recorded matter of any kind whatsoever.  The term "document" also means and includes every other means by which information is recorded or transmitted including, without limitation, photographs, videotapes, tape recordings, microfilms, punchcards, computer programs, printouts, computer disks or diskettes, software, all recordings made through data processing and/or computer techniques, and the written information necessary to understand and use such materials.  The term "document" is further defined to mean the original, any drafts, and any nonidentical copies (i.e., those bearing notations or marks not found on the original document).

2.     The term "person" refers to a natural person, a group of natural persons acting as individuals, a group of persons acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, a partnership, a limited partnership, a joint venture, a limited liability corporation, a government or governmental agency and/or any other incorporated or incorporated business, government or entity.

3.     "Blackstone," means Defendant Blackstone Calling Card, Inc. (including any predecessors in interest or under any former names thereof), its directors, officers, employees, agents, representatives and/or other individuals acting on its behalf, including attorneys, and all wholly owned or commonly owned affiliates, subsidiaries, parents, or other organizations along with each of their directors, officers, employees, agents, representatives and/or other individuals acting on its behalf, including attorneys.

4.     "Qwest" means Plaintiff Qwest Communications Corp., its directors, officers, employees, agents, representatives and/or other individuals acting on its behalf, including attorneys, and all wholly owned or commonly owned affiliates, subsidiaries, parents, or other organizations along with each of their directors, officers, employees, agents, representatives and/or other individuals acting on its behalf, including attorneys.

5.     "Ocean Bank," "you" or "your" refers to Ocean Bank (including any predecessors in interest or under any former names thereof), its directors, officers, managers, employees, agents, representatives and/or other individuals acting on its behalf, including attorneys, and all wholly owned or commonly owned affiliates, subsidiaries, parents, or other organizations along with each of their directors, officers, managers, employees, agents, representatives and/or other individuals acting on its behalf, including attorneys.

**DOCUMENT REQUESTS**

)                                                                    )

1.    All Ocean Bank account records of (a) Blackstone and (b) Luis Arias.

2.    All agreements, including without limitation account opening documents and new account forms, of (a) Blackstone and (b) Luis Arias.

3.    All documents regarding loans that Ocean Bank made to (a) Blackstone and (b) Luis Arias.

4.    All loan and/or account applications that were submitted to Ocean Bank by (a) Blackstone and (b) Luis Arias.

5.    All work papers and financial statements or similar statements of the assets, liabilities and/or net worth, including but not limited to statements from all checking, savings, trust and brokerage accounts maintained by them or on their behalf, from January 1, 2001 through the present, of (a) Blackstone and (b) Luis Arias.

6.    All documents from January 1, 2001 through the present regarding Ocean Bank account numbers (a) in the name of Blackstone, or in which either Blackstone has or had a beneficial interest, and (b) in the name of Luis Arias, or in which either Luis Arias has or had a beneficial interest.

7.    All correspondence, from January 1, 2001 through the present, between Ocean Bank and (a) Blackstone and (b) Luis Arias.

8.    All correspondence, from January 1, 2001 through the present, between Ocean Bank and any other individual, including without limitation any counsel for Blackstone

)                                                    )

and/or Luis Arias, regarding (a) Blackstone and/or its accounts and (b) Luis Arias and/or his accounts.

9.    All notes, records, diaries, memoranda and/or calendars of any Ocean Bank representative, from January 1, 2001 through the present, regarding the accounts of (a) Blackstone and (b) Luis Arias.

10.    All spreadsheets and or financial projections from January 1, 2001 through the present regarding (a) Blackstone and (b) Luis Arias.

11.    All documents regarding any trusts for which the beneficiaries were (a) Blackstone and (b) Luis Arias.

**EXHIBIT 3**

# OCEAN BANK

LEGAL DEPARTMENT

MICHAEL C. MONTERO
Attorney at Law

VOICE:     (305) 569-5423
FAX:       (305) 446-1276
EMAIL: mmontero@oceanbank.com

July 3, 2002

Douglas P. Lobel, Esq.
Joseph F. Yenouskas, Esq.
Morgan, Lewis & Bockius, LLP
1600 Tysons Boulevard
McClean, Virginia 22102

<u>**VIA FAX (703) 918-1999 & US MAIL**</u>

Re:    **Qwest Communication Corp. v. Blackstone Calling Card, Inc.**
       **(U.S. District Court for the Eastern District of Virginia, Civil Action No. 02-454-A)**
       <u>**Subpoenas to Ocean Bank**</u>

Dear Messrs. Lobel and Yenouskas:

I am counsel for Ocean Bank, which was served with a subpoena for records of our customers Blackstone Calling Card, Inc. and Luis Arias.

Pursuant to Fed. R. Civ. P. 45(c)(1)(B), Ocean Bank objects to inspection and copying of all of the designated materials.

Sincerely,

Michael C. Montero

MCM:gs

cc:    Steve Kolski, Esq. (Via Fax (305) 371-8011

780 N.W. 42nd Avenue, Suite 300 • Miami, FL 33126-5597
PO Box 441140 • Miami, FL 33144-1140

**EXHIBIT 4**

1600 Tysons Boulevard

McLean, VA 22102-4824

703-918-1000

Fax: 703-918-1999

# Morgan, Lewis
# &Bockius LLP

### COUNSELORS AT LAW

Joseph F. Yenouskas
703.918.1767
JYenouskas@MorganLewis.Com

July 8, 2002

*BY FACSIMILE*

Michael C. Montero
OCEAN BANK – Legal Department
780 N.W. 42nd Avenue, Suite 300
Miami, Florida  33144

>       Re:     *Qwest Communications Corporation v. Blackstone Calling Card, Inc.*
>                *No. 02-454-A (E.D. Virginia)*

Dear Mr. Montero:

We received your letter dated July 3, 2002 (which was faxed to us today) in which Ocean Bank objected to Qwest Communications Corporation's subpoena for records of Blackstone Calling Card, Inc. and Luis Arias.  Your letter provides no basis for Ocean Bank's objection as required by Rule 45(c)(1)(B).  Please let us know the basis for your objections.

Sincerely,

Joseph F. Yenouskas

**EXHIBIT 5**

1600 Tysons Boulevard

McLean, VA 22102-4824

703-918-1000

Fax: 703-918-1999

# Morgan, Lewis
# & Bockius LLP

C O U N S E L O R S   A T   L A W

**Joseph F. Yenouskas**
703.918.1767
JYenouskas@MorganLewis.Com

July 19, 2002

*BY FACSIMILE*

Michael C. Montero
OCEAN BANK – Legal Department
780 N.W. 42nd Avenue, Suite 300
Miami, Florida 33144

    *Re:* *Qwest Communications Corporation v. Blackstone Calling Card, Inc.*
       *No. 02-454-A (E.D. Virginia)*

Dear Mr. Montero:

    Your letter dated July 3, 2002 stated no basis for Ocean Bank's objected to Qwest Communications Corporation's subpoena. We wrote you on July 8, 2002 requesting the basis for your objections, but you failed to respond to our letter. James Deacon of this office called you to discuss this matter earlier this week, and you stated that Ocean Bank would provide no further information about its non-compliance. Federal Rules 45(c) and (d) require a party objecting to a subpoena to (1) state the basis of its objections and (2) provide a description of the documents "sufficient to enable the demanding party to contest the claim." Ocean Bank has violated both rules, requiring Qwest to file a motion to compel with the Court.

           Sincerely,

           Joseph F. Yenouskas

Philadelphia Washington New York Los Angeles Miami Harrisburg Pittsburgh Princeton

JS 44
(Rev. 8/01)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

QWEST COMMUNICATIONS CORPORATION,

**DEFENDANTS**

BLACKSTONE CALLING CARD, INC.

**CIV-GRAHAM**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Robert M. Brochin, Esq. and Douglas Lobel, Esq.
Morgan, Lewis & Bockius LLP
5300 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-2339
Telephone: 305-579-0300

**ATTORNEYS (IF KNOWN)**
W. Charles Bailey, Jr.
Gerber Simms & Showers LLP
20 S. Charles Street, Suite 702
Baltimore, Maryland 21201
Telephone: 410-783-5795

**MAGISTRATE JUDGE GARBER**

*Memo. Dade - 02CV 22322/DG Baker*

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: Dade, Monroe, Broward, Palm Beach, Martin, St. Lucie, Indian River, Okeechobee, Highlands

| II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY) | III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (FOR DIVERSITY CASES ONLY) | | |
|---|---|---|---|
| ☐ 1 Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | | PTF DEF |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in item III) | Citizen of This State ☐1 ☒ 1 | Incorporated or Principal Place of Business in This State ☐ 4 ☐ 4 |
| | | Citizen of Another State ☐ 2 ☐2 | Incorporated and Principal Place of Business in Another State ☐5 |
| | | Citizen or Subject of a Foreign Country ☐ 3 ☐ 3 | Foreign Nation ☐ 6 ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Malpractice | ☐ 625 Drug Related | USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | Seizure of Property | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | 21 USC 881 | **A PROPERTY RIGHTS** | ☐ 460 Deportation |
| and Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal Injury | ☐ 630 Liquor Laws | | ☐ 470 Racketeer |
| ☐ 151 Medicare Act | ☐ 330 Federal | Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | Influenced and Corrupt |
| ☐ 152 Recovery of Defaulted | Employers | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | Organizations |
| Student Loan | Liability | ☐ 370 Other Fraud | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 810 Selective Service |
| (Excl. Veterans) | ☐ 340 Marine | ☐ 371 Truth in Lending | Safety/Health | | ☐ 850 Securities/ |
| ☐ 153 Recovery of Overpayment | ☐ 345 Marine Product | ☐ 380 Other Personal | ☐ 690 Other | | 0Commodities/Exchange |
| of Veteran's Benefits | Liability | Property Damage | | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 385 Property Damage | | | 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 355 Motor Vehicle | Product Liability | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | Product Liability | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| | ☐ 360 Other Personal | | ☐ 710 Fair Labor | ☐ 863 DIWC/DIWW | ☐ 893 Environmental Matters |
| | Injury | | Standards Act | (405(g)) | ☐ 894 Energy Allocation Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| | | | Relations | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 730 Labor/Mgmt. | | Determination Under |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | Reporting & | **FEDERAL TAX SUITS** | Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **HABEAS CORPUS** | Disclosure Act | | ☐ 950 Constitutionality of State |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S.) Plaintiff or | Statutes |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor | Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 290 All other Real Property | ☐ 440 Other Civil | ☐ 540 Mandamus & Other | Litigation | ☐ 871 IRS- Third Party | A or B |
| | Rights | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | |
| | | ☐ 555 Prison Condition | Security Act | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY) : Motion to Compel Response to Third Party Subpoena (underlying action pending in Eastern District of Virginia for breach of contract, unjust enrichment and defamation)

LENGTH OF TRIAL:

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** Excess of $75,000 | CHECK YES only if demanded in complaint: JURY DEMAND: ☐ YES ☒ NO |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See instructions): | JUDGE CLAUDE M. HILTON | DOCKET NUMBER CA-02-454-A (EDVA) |
|---|---|---|---|
| | | JUDGE ADALABERTO JORDAN | DOCKET NUMBER 02-21239-CIV-JORDAN |

DATE  August 5th, 2002

SIGNATURE OF ATTORNEY OF RECORD

$150.00 / 86686T

FOR OFFICE USE ONLY
RECEIPT#_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

08/06/02